BARNES, J.,
for the Court:
¶ 1. In 1995, Fannie Lee Burks was murdered in her apartment in Tunica County, Mississippi. At that time, the murder was deemed unsolved, and the case “went cold.” However, in 2008, the Tunica County Sheriffs Office tested biological evidence that was found under Burks’s fingernails at the time of her murder. The evidence had been stored in the property room. The DNA profile found under the fingernails of her right hand was consistent with that of Joe Cotton. In 2011, Cotton was charged with Burks’s murder. After a jury trial in the Tunica County Circuit Court in April 2012, Cotton was found guilty of murder. He was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). Cotton now appeals, arguing the evidence was insufficient to support the verdict and the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm Cotton’s conviction and sentence.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. On April 9, 1995, Burks’s body was found in her apartment in Tunica, Mississippi. She had been shot three times, and some of her jewelry was missing. It was determined her death occurred after 12:01 a.m. There was no indication of forced entry, no eyewitnesses to the crime, and no weapon recovered.
¶ 3. At the time of the original investigation, fingernail scrapings were taken as evidence. In 2008, the cold case was reviewed by the Tunica County Sheriffs Office, and the fingernail scrapings, which had been stored in the property room of the Tunica County Sheriffs Office, were sent for DNA analysis. A DNA analyst found the right-hand fingernail scrapings contained DNA, which can remain present “for years.” The DNA profile was found to be “a mixture of more than one person including an unknown male[,] and Fannie Burks could not be excluded as a contributor” to the sample. The results were compared to DNA profiles in a national database, and Cotton was found to be a *164 potential match. The sheriffs office obtained an oral swab from Cotton through a search warrant and compared it to the DNA analysis results. Since the initial DNA analysis used all of the scrapings sample, there was no DNA sample left to re-analyzed. The DNA profile contained in the fingernail scrapings was found to be consistent with that of Cotton.
¶ 4. Prior to her death, Burks had worked as a cook at Nickson’s Café (a/k/a Nickson’s Disco Club) in downtown Tunica. Burks’s good friend, Ms. Willie Nickson, testified at trial that on the afternoon of April 8, 1995, she stopped by to see Burks at the café. They made plans to eat lunch the next day. As they spoke, Nickson noticed Burks was putting rings on her fingers. Nickson also helped Burks put on a herringbone necklace. The next day, after Nickson called Burks’s apartment and got no answer, Nickson and a friend went to Burks’s apartment. Burks’s automobile was in the parking lot, but Burks, did not answer their knocks on the door and window. The apartment manager unlocked the door, and Burks’s body was discovered. According to Nickson, Burks was wearing the same dress as the day before, but she did not have on the necklace, and all but one ring was missing from her fingers.
¶ 5. Deputy Sheriff Marco Sykes testified that when he was called to the scene of the murder, he found Burks’s body lying face down on the floor of her apartment. The television was on, but the telephone was off the hook. An empty jewelry box was found in Burks’s bedroom at the foot of her bed. Sykes stated “[i]t appeared that someone had been in the attic.” The attic door in the hallway was pushed up, and there was a chair and several pillows underneath the attic stair opening. Insulation that matched the insulation in the attic was on the kitchen floor, and pieces of hair were found in the kitchen sink. There was no indication of forced entry.
¶ 6. Dr. Steven Hayne performed Burks’s autopsy. He took fingernail scrapings from Burks’s right and left hands and submitted this evidence to investigators. He noted that Burks was wearing only one earring, and no other jewelry was on her body. Dr. Hayne testified at trial that the three gunshot wounds — one to her front abdomen, one to her left flank, and one to the back of her head — were all close contact wounds and were all lethal.
¶ 7. Sheriff Kalvin Hamp testified that Cotton gave conflicting statements as to whether he came into contact with Burks the night of the murder. In Cotton’s initial statement to police, he repeatedly denied having seen Burks the night of her murder; however, he later admitted that he had been to the club where Burks worked on April 8, 1995, and Burks had waited on him. He bought a sandwich, which Burks passed to him in a brown paper bag. Sheriff Hamp also testified that Cotton waffled about whether or not Burks could have scratched him while passing him the sandwich bag. Cotton also told investigators that he had been to Burks’s apartment on two separate undisclosed prior dates — to return some stolen property of hers and to help move furniture into her apartment. In addition, Cotton’s mother lived in the same apartment complex as Burks.
¶ 8. The only direct evidence tying Cotton to Burks’s murder was the presence of his DNA under her right-hand fingernail scrapings. William Jones, a forensic scientist qualified as an expert in the field of forensic DNA analysis, testified that Cotton could not be excluded as a contributor of DNA found in fingernail scrapings taken from Burks during her autopsy. Jones tested thirteen genetic markers from the *165 right-fingernail scrapings of Burks. The genetic profile excluded “greater than 99.99 percent of the Caucasian, African-American and Hispanic populations.” The scrapings were a mixture of at least two individuals, one of whom was a male, and that mixture had a DNA profile consistent with Cotton, i.e., he could not be excluded as a contributor. Nor could Burks be excluded as a contributor to the mixture. Jones testified that, in his opinion, the DNA was a mixture of Cotton’s and Burks’s, to “a very high degree of [scientific] certainty.” Jones admitted that DNA could be transferred between individuals by casual contact. Cotton did not testify at trial; nor did he put on any witnesses in his defense.
¶ 9. After the three-day trial, the jury returned a verdict of guilty in less than an hour of deliberations. The trial court sentenced Cotton to life in the custody of the MDOC. He filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied. Cotton now appeals.
ANALYSIS
¶ 10. Cotton argues the evidence was insufficient and the verdict was against the overwhelming weight of the evidence. Cotton asserts the presence of his DNA under Burks’s fingernails proves nothing more than a casual encounter between himself and Burks.
¶ 11. When considering the sufficiency of the evidence on appeal, the critical inquiry is whether the evidence shows “beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). However, when the evidence in a case is circumstantial, we must scrutinize the jury’s verdict more closely. Madden v. State, 42 So.3d 566, 569 (¶ 9) (Miss.Ct.App.2010).
¶ 12. When considering the weight of the evidence, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The evidence will be viewed in the light most favorable to the verdict. Id. It is the jury’s role to assess the weight and credibility of the evidence and to resolve any conflicts in the evidence. Latiker v. State, 918 So.2d 68, 73 (¶ 12) (Miss. 2005). Furthermore, “the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily' against the verdict.” Bush, 895 So.2d at 844 (¶ 18) (quoting Am-iker v. Drugs for Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 13. It is undisputed that the evidence in this case was purely circumstantial. “[W]hen the prosecution’s case is entirely circumstantial, it must prove the defendant’s guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.” Staten v. State, 989 So.2d 938, 943 (¶ 9) (Miss.Ct.App.2008) (quoting Bil-liot v. State, 454 So.2d 445, 461 (Miss. 1984)).
¶ 14. After a careful review of the record, this Court finds the evidence, albeit circumstantial, sufficient to sustain the conviction. There is a jury question as to how Cotton’s DNA came to be under the nails of Burks’s right hand. Cotton gave contradicting statements as to whether he had come into contact with Burks on the night of her murder. Sheriff Hamp testi *166 fied that in Cotton’s statement to police, Cotton repeatedly denied that he had seen Burks on the night of her murder, or prior to it. However, Cotton was a patron of the night club where Burks worked as a cook, and he did finally admit that he ordered a sandwich at the club on the night Burks was murdered and that she passed the sandwich to him in a brown paper bag. Initially, Cotton stated there could have been a possibility Burks scratched him while passing the bag, but he acknowledged he probably would have known for certain if she had scratched him. Then later, Cotton stated Burks had never scratched him. And yet, undoubtedly, his DNA was under her fingernails. The State’s forensic DNA expert witness, Jones, testified Cotton could not be excluded as a contributor of DNA found in fingernail scrapings taken from Burks during her autopsy, and that there was a “very high degree of [scientific] certainty” that the DNA was a mixture of Cotton’s and Burks’s.
¶ 15. While it is plausible, as Cotton argues, that his DNA came to be under Burks’s fingernails through the casual contact of passing him a sandwich in a brown bag, and not another more violent encounter, it is not a reasonable conclusion. Cotton would have had to have been one of Burks’s last customers at the club. She would have had to pass the bag to Cotton somehow using her fingernails rather than her fingers. Then, Burks would have had to finish work without washing her hands and without passing food to any other parties, in such a manner as to get their DNA under her nails.[1]
¶ 16. Additionally, the evidence indicates Cotton had both motive and opportunity to murder Burks. A reasonable jury could well have found Cotton’s motive to be the robbery of Burks’s jewelry, and his opportunity the fact Burks lived “pretty close” to Cotton’s mother, in the same apartment complex. According to Nick-son, the night prior to Burks’s murder she was wearing rings on each hand and a herringbone necklace. When her body was discovered the following day, Burks was wearing the same dress as the night before, but her necklace and all but one ring were missing. Also, her jewelry box was found empty. If the jury believed that Cotton in fact saw Burks at the club and was handed a sandwich by her, then they could also believe he saw the jewelry that Burks was wearing that night.
¶ 17. As for opportunity, Cotton and Burks knew one another, and Cotton knew where Burks lived. Cotton had been to Burks’s apartment twice before — first to return stolen property of hers Cotton received from one of Burks’s sons, and second to help one of Burks’s sons move furniture into her apartment. There were no visible signs of forced entry to her apartment. Burks’s apartment door was found locked, meaning the killer locked it on the way out. Her kitchen window was closed but unlocked. Officer Sykes testified that it appeared someone had been in her attic. The jury could reasonably find from this evidence that Burks either let Cotton inside her apartment that night because she knew him, or he was already hiding within her apartment when she came home from work.
*167 ¶ 18. Further, Dr. Hayne testified that Burks’s three gunshot wounds were all “contact wounds”; that is, the muzzle of the weapon was in contact with Burks’s body when it was fired each time. One wound was to her front abdomen, one wound was to her left flank, and another wound was to the back of her head, indicating the murderer shot from in front, to the side, and from behind Burks. The jury could reasonably find that Burks was close enough to her attacker that she could have scratched him with her nails. Also, Dr. Hayne’s autopsy revealed the presence of a one-half-inch scrape or abrasion of Burks’s skin over the “upper outer left chest wall.” Reasonable and fair-minded jurors could find this scrape came from physical contact with her killer.
¶ 19. Courts in other jurisdictions have affirmed criminal convictions based only on DNA evidence. In State v. Abdelma-lik, 273 S.W.3d 61, 62, 64 (Mo.Ct.App. 2008), DNA evidence found under the victim’s fingernails was used to link the defendant to the murder, and was found sufficient to support a conviction for capital murder. The Abdelmalik court noted that the issue of “whether DNA evidence alone can provide sufficient evidence of identity to support a conviction is one of first impression in Missouri.” Id. at 66. However, their decision “is consistent with other state and federal jurisdictions, which have uniformly held that DNA evidence, alone, can provide sufficient evidence to support a criminal conviction.” Id. In Ab-delmalik, a substantial amount of DNA evidence was recovered from under the victim’s fingernails, which is inconsistent with casual contact. Id. at 64-65.
¶ 20. In the case before us, there is a possibility that the DNA could have come from casual contact, but it is unreasonable to believe that DNA from any casual contact would have remained under the victim’s nails given her occupation of cook and habit of washing her hands often while she worked. Further, it is unreasonable to believe that if Burks did not wash her hands after casual contact with Cotton, she would not have had any debris from cooking under her nails.
¶ 21. In State v. Nash, 339 S.W.3d 500, 504, 510 (Mo.2011), the Missouri Supreme Court found sufficient evidence to uphold a murder conviction when the State’s only evidence was that the victim’s and the defendant’s DNA was found under the victim’s fingernails at the time .of her death.[2] While a circumstantial-evidence instruction was denied, the Nash court found that the DNA evidence, taken with the other evidence about the murder, was sufficient. Id. at 511. The following statement by the Nash court is instructive:
It is not this Court’s role to reweigh the DNA evidence to contradict the jury’s conclusions_There was sufficient evidence to support the jury’s conclusions that Nash’s DNA, rather than a third person’s DNA, was present under [the victim’s] fingernails because Nash was the last person to have contact with [the victim] before she was killed.
Id. The only reasonable conclusion in this case is that Cotton was the last person to *168 have contact with Burks before she was killed.
¶ 22. There was sufficient evidence to prove to reasonable and fair-minded jurors, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, that Cotton shot and killed Burks. Further, Cotton’s conviction does not sanction an unconscionable injustice. Accordingly, we affirm Cotton’s conviction and sentence for the murder of Burks.
¶ 23. THE JUDGMENT OF THE TU-NICA COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TUNICA COUNTY.
LEE, C.J., ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING AND GRIFFIS, P.JJ.

. Jones testified that DNA on the hands would be removed naturally over time by either washing or normal use. Taking a bath would "absolutely” remove it. Burks’s friend, Nick-son, testified that Burks was "a real neat, clean lady” who would wash her hands often while working. Further, as the prosecution argued, there was no commeal or other material that she might have cooked with under her fingernails — her nails were fairly clean, except for Cotton's DNA. Dr. Hayne testified that during Burks's autopsy, he did not "see any foreign materials underneath the fingernails but ... scraped them anyway.”

. See also State v. Scott, 97 So.3d 1046, 1049-50, 1052 (La.Ct.App.2012) (Evidence of the defendant’s DNA found under the fingernails of the victim's grandmother, who allegedly scraped the defendant’s neck at the scene of the shooting, was the only physical evidence linking the defendant to the murder, as the grandmother could not identify the perpetrator. In this circumstantial-evidence case, the court concluded that the DNA evidence was sufficient to support a conviction, and "every reasonable hypothesis of innocence” had been excluded.).