ON WRIT OF CERTIORARI

LAMAR, Justice,
for the Court:
¶ 1. Joe Cotton was convicted of murder in the death of Fannie Lee Burks. He appeals from his conviction, challenging the sufficiency and the weight of the evidence. Finding no error, we affirm Cotton’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
¶ 2. The following facts are taken from the Court of Appeals’ opinion:
On April 9, 1995, [Fannie Lee] Burks’s body was found in her apartment in Tunica, Mississippi. She had been shot three times, and some of her jewelry was missing. It was determined her death occurred after 12:01 a.m. There was no indication of forced entry, no eyewitnesses to the crime, and no weapon recovered.
At the time of the original investigation, fingernail scrapings were taken as evidence. In 2008, the cold case was reviewed by the Tunica County Sheriffs Office, and the fingernail scrapings, which had been stored in the property room of the Tunica County Sheriffs Office, were sent for DNA analysis. A DNA analyst found the right-hand fingernail scrapings contained DNA, which can remain present “for years.” The DNA profile was found to be “a mixture of more than one person including an unknown male[,] and Fannie Burks could not be excluded as a contributor” to the sample. The results were compared to DNA profiles in a national database, and Cotton was found to be a potential match. The sheriffs office obtained an oral swab from Cotton through a search warrant and compared it to the DNA analysis results. Since the initial DNA analysis used all of the scrapings sample, there was no DNA sample left to re-analyzed. The DNA profile contained in the fingernail scrapings was found to be consistent with that of Cotton.
Prior to her death, Burks had worked as a cook at Nickson’s Café (a/k/a Nick-son’s Disco Club) in downtown Tunica. Burks’s good friend, Ms. Willie Nickson, testified at trial that on the afternoon of April 8, 1995, she stopped by to see Burks at the café. They made plans to eat lunch the next day. As they spoke, Nickson noticed Burks was putting rings on her fingers. Nickson also helped Burks put on a herringbone necklace. The next day, after Nickson called Burks’s apartment and got no answer, Nickson and a friend went to Burks’s apartment. Burks’s automobile was in the parking lot, but Burks did not answer their knocks on the door and window. The apartment manager unlocked the door, and Burks’s body was discovered. According to Nickson, Burks was *139 wearing the same dress as the day before, but she did not have on the necklace, and all but one ring was missing from her fingers.
Deputy Sheriff Marco Sykes testified that when he was called to the scene of the murder, he found Burks’s body lying face down on the floor of her apartment. The television was on, but the telephone was off the hook. An empty jewelry box was found in Burks’s bedroom at the foot of her bed. Sykes stated “[i]t appeared that someone had been in the attic.” The attic door in the hallway was pushed up, and there was a chair and several pillows underneath the attic stair opening. Insulation that matched the insulation in the attic was on the kitchen floor, and pieces of hair were found in the kitchen sink. There was no indication of forced entry.
Dr. Steven Hayne performed Burks’s autopsy. He took fingernail scrapings from Burks’s right and left hands and submitted this evidence to investigators. He noted that Burks was wearing only one earring, and no other jewelry was on her body. Dr. Hayne testified at trial that the three gunshot wounds— one to her front abdomen, one to her left flank, and one to the back of her head— were all close contact wounds and were all lethal.
Sheriff Kalvin Hamp testified that ... [i]n [hi]s initial statement to police, [Cotton] repeatedly denied having seen Burks the night of her murder; however, he later admitted that he had been to the club where Burks worked on April 8, 1995, and Burks had waited on him. He bought a sandwich, which Burks passed to him in a brown paper bag- Cotton also told investigators that he had been to Burks’s apartment on two separate undisclosed prior dates — to return some stolen property of hers and to help move furniture into her apartment. In addition, Cotton’s mother lived in the same apartment complex as Burks.
The only direct evidence tying Cotton to Burks’s murder was the presence of his DNA under her right-hand fingernail scrapings. William Jones, a forensic scientist qualified as an expert in the field of forensic DNA analysis, testified that Cotton could not be excluded as a contributor of DNA found in fingernail scrapings taken from Burks during her autopsy. Jones tested thirteen genetic markers from the right-fingernail scrapings of Burks. The genetic profile excluded “greater than 99.99 percent of the Caucasian, African American and Hispanic populations.” The scrapings were a mixture of at least two individuals, one of whom was a male, and that mixture had a DNA profile consistent with Cotton, i.e., he could not be excluded as a contributor. Nor could Burks be excluded as a contributor to the mixture. Jones testified that, in his opinion, the DNA was a mixture of Cotton’s and Burks’s, to “a very high degree of [scientific] certainty.” Jones admitted that DNA could be transferred between individuals by casual contact. Cotton did not testify at trial; nor did he put on any witnesses in his defense. After the three-day trial, the jury returned a guilty verdict [and][t]he trial court sentenced Cotton to life [imprisonment]. [Cotton] filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied.[1]
*140 Cotton timely appealed his conviction, challenging the sufficiency and the weight of the evidence.[2] The Court of Appeals affirmed, and this Court granted Cotton’s petition for certiorari. Finding no error, we affirm Cotton’s conviction and sentence.
LAW AND ANALYSIS
1. Sufficiency of the Evidence
¶ 3. Since the only connection between Cotton and Burks’s murder is the presence of Cotton’s DNA under Burks’s fingernails at the time of her death, this is an entirely circumstantial-evidence case.
When the State’s case is based entirely upon circumstantial evidence the State is required to prove the defendant guilty not only beyond a reasonable doubt but to the exclusion of every reasonable hypothesis consistent with innocence. Circumstantial evidence need not exclude every “possible doubt” but only every other “reasonable” hypothesis of [innocence], A mere fanciful or farfetched or unreasonable hypothesis of innocence is not sufficient to require an acquittal.... When reviewing a jury verdict of guilty we are required to accept as true all the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such will support a verdict of guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, then the jury verdict shall not be disturbed.[3]
¶ 4. Cotton claims he should be acquitted because the “[e]vidence that a very small[,] unknown quantity of Joe Cotton’s DNA was found under the fingernails of Ms. Burks’[s] right hand cannot, without more proof, support a reasonable circumstantial conclusion that Mr. Cotton murdered Ms. Burks.”
¶ 5. While no Mississippi case bears directly on the sufficiency of DNA evidence alone, other jurisdictions have affirmed convictions based solely on DNA evidence. See State v. Toomes, 191 S.W.3d 122, 129-31 (Tenn.Crim.App.2005); Roberson v. State, 16 S.W.3d 156, 169-71 (Tex. Ct.App.2000); Rush v. Artuz, 2009 WL 982418, *11 (E.D.N.Y. April 10, 2009); State v. Hunter, 169 Ohio App.3d 65, 861 N.E.2d 898, 901 (2006); State v. Abdelma-lik, 273 S.W.3d 61, 66 (Mo.Ct.App.2008); see also Maryland v. King, — U.S.-, -, 133 S.Ct. 1958, 1964, 186 L.Ed.2d 1 (2013) (emphasizing that DNA provides “unparalleled accuracy” and is “far superi- or” to fingerprinting with regard to identifying criminals). In accordance with those decisions, we conclude that, when DNA material is found in a location inconsistent with casual contact and absent a “reasonable hypothesis consistent with innocence,” DNA evidence alone can be sufficient to support a conviction. We caution that we are not announcing a principle that DNA evidence alone will always be sufficient to support a conviction. Every conviction relying on DNA evidence must stand on its own merits.
¶ 6. Here, an expert in forensic DNA analysis testified that “[t]he genetic *141 profile for the DNA donor of the right fingernail scrapings [from Burks] excludes greater than 99.99 percent of the Causea-sian, African-American and Hispanic populations,” but that “Joe Cotton cannot be excluded as being a contributor to the mixture of the scrapings.” Cotton does not dispute that his DNA was found under Burks’s fingernails. Rather, he proffers the following “hypothesis” as to how it got there:
Cotton told investigators that Ms. Burks had waited on him in Nickson’s café. She could have come into contact with him then. Just as likely, she cleaned up after him. If so, she came into contact with his eating utensils and napkin, both of which would have had Mr. Cotton’s DNA on them. Ms. Burks could have picked up money handled by Cotton either as payment for the food or a tip and collected his DNA then.
In short, Cotton argues that Burks could have gotten his DNA under her nails through casual contact when she waited on him at the café, and, therefore, his conviction must be reversed and rendered because this is a reasonable hypothesis consistent with innocence.
¶ 7. A hypothesis must be based on evidence and the reasonable inferences that can be drawn from the evidence. A hypothesis is “[a] supposition based on evidence but not proven; a proposed explanation, supported by evidence, that serves as a starting point for investigation.”[4] Cotton’s argument hinges on Burks touching him, his dishes, or his money at the café. However, there is no evidence that Burks touched Cotton or his belongings. The only evidence that Cotton and Burks interacted at the café came from Sheriff Hamp, who testified that:
A. [Cotton] stated he received the food from Ms. Fannie Burks [the night she was murdered]. He ordered a sandwich and she passed him a brown bag. And I asked him was there a possibility she could have scratched him and stated, um, yes, it was a possibility. Then we asked, “Well, if you were scratched, wouldn’t you have known you were scratched when somebody’s passing you a bag?” He stated, yes, he would have known if he was scratched.
Q. Okay. And so after [Cotton] said he would have known if he was scratched, so did you then ask him if she had ever scratched him?
A. Yes, I did.
Q. What was his answer to that?
A. No.
This testimony does not support an inference of even casual contact. In fact, it negates such an inference, as Cotton said Burks did not scratch him. It also does not provide a basis for Cotton’s argument that Burks cleaned up after Cotton or handled his money. Instead, it merely posits that Burks passed Cotton a brown paper bag several hours before she was murdered.
¶ 8. Cotton also relies on the following testimony from the State’s DNA expert, William Jones:
Q. ... And as far as leaving, a person leaving DNA, if I touched you on your — -just say on your forehead with my hand, would it be likely that I would have your DNA on my hand or under my fingernails?
A. It be likely that — I would say it would be possible. It depends on the circumstances. If it was just a glancing touch, I would say not like- *142 ■ ly. If I’m bleeding, I would say extremely likely.
Q. Okay.
A. If I’m sweating, I would say yes, reasonably likely that from the sweat you got a little bit, a little bit of my DNA on your fingers or something.
Q. On the fingers?
A. Yeah, wherever you touched.
Q. Okay. Would you expect it to be under the nails, in the nail scrapings?
A. Well, if you didn’t actually get your nails on me, I would not expect it. But in my DNA world I wouldn’t say anything is possible but I would want to do a little experiment a few times to see before I would give up on whether it could or could not happen.
Q. [I]f you come in contact with a person or if you come if [sic] contact with a person by a handshake or rubbing of the head or patting on the back. Is it possible that DNA will stay in the fingernails?
A. If the fingernails actually are what is touching, yes. There can be DNA adhering to it if you’re touching somebody with your fingernails, scratching their back or whatever.
However, Cotton’s reliance on this testimony is misplaced. There is no evidence that Burks touched Cotton’s forehead, shook his hand, rubbed his head, or patted his back at the café. And for his reasonable hypothesis to stand, it must be founded in the record evidence and the reasonable inferences that can be drawn from that evidence — not merely supposition about what “could have been.” Because Cotton’s DNA was found under Burks’s fingernails, a circumstance inconsistent with casual contact, and because there is not a “reasonable hypothesis consistent with innocence” to explain its presence, we find the evidence sufficient to support the jury’s guilty verdict. It is not our job as an appellate court to ask whether we believe “that the evidence at trial established guilt beyond a reasonable doubt [but][i]nstead, the relevant inquiry is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”[5] We find that he or she could. For these reasons, the trial court’s denial of Cotton’s motion for judgment notwithstanding the verdict is affirmed.
II. Weight of the Evidence
¶ 9. Finally, and in the alternative, Cotton claims that he is entitled to a new trial because his conviction is against the overwhelming weight of the evidence. A motion for a new trial should be granted only in “exceptional cases in which the evidence preponderates heavily against the verdict.”[6] When reviewing the denial of a motion for a new trial, the evidence must be viewed in the light most favorable to the verdict.[7] A verdict should be upheld unless it “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”[8] This occurs only if reasonable men could not have found the defendant *143 guilty based on the evidence when it is viewed in the light most favorable to the verdict.[9] For the reasons stated in the sufficiency-of-the-evidence analysis, allowing the jury’s guilty verdict to stand does not sanction an unconscionable injustice against Cotton. Finding no error, we affirm both the judgment of the Court of Appeals and Cotton’s conviction and sentence in the trial court.
¶10. CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THIS SENTENCE SHALL RUN CONSECUTIVELY WITH ANY PREVIOUSLY IMPOSED SENTENCES.
WALLER, C.J., RANDOLPH, P.J., PIERCE AND COLEMAN, JJ., CONCUR. KITCHENS, J„ DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P. J., CHANDLER AND KING, JJ.

. Cotton v. State, 144 So.3d 162, 163-66, 2013 WL 3894864, **1-3 (Miss.Ct.App. July 30, 2013).

. Id. at 165-66, 2013 WL 3894864, at *3.

. Montgomery v. State, 515 So.2d 845, 848 (Miss. 1987) (internal citations omitted); see also Bush v. State, 895 So.2d 836, 843 (Miss. 2005) (stating an appellate court is not required "to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt [but][i]nstead, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt”).

. Black's Law Dictionary 760 (8th ed.2004) (emphasis added).

. Bush, 895 So.2d at 843 (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

. Weatherspoon v. State, 56 So.3d 559, 564 (Miss.2011).

. Id. at 564.

. Jenkins v. State, 947 So.2d 270, 278 (Miss. 2006) (quoting Baker v. State, 802 So.2d 77, 81 (Miss.2001)).

. Bush, 895 So.2d at 844 (Miss.2005) (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (Miss.2000)).