# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00626-COA

**LATIFFANY CHAMBERS A/K/A LATIFFANY MOREE CHAMBERS**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:                04/14/2023
TRIAL JUDGE:                HON. ADRIENNE ANNETT HOOPER-WOOTEN
COURT FROM WHICH APPEALED:                HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:                OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:                OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER
DISTRICT ATTORNEY:                JODY EDWARD OWENS II
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Latiffany Chambers was indicted on one count of capital murder for the death of her daughter L.T. and on two counts of felonious child abuse of her children D.C. and A.C.,[1] while acting in concert with and/or aiding and abetting her fiancé, Danny Dabbs. A Hinds County jury found Chambers guilty on all three charges. The Hinds County Circuit Court sentenced Chambers to life imprisonment without eligibility for parole for her capital murder

---

[1] We use initials to protect the children's privacy.

conviction and ten years for each felonious child abuse conviction, to be served consecutively in the custody of the Mississippi Department of Corrections. After the denial of her post-trial motions, Chambers appealed, arguing that the trial court erred in failing to suppress her statement to law enforcement and that the State presented insufficient evidence to convict her of any of the three charges. After reviewing the parties' arguments, the record, and legal precedent, we affirm Chambers's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. On October 31, 2020, the Jackson Police Department dispatched officers to 636 Lowder Drive. When Officer Reginald Craft arrived, the medical first responders were outside the home treating seventeen-year-old L.T., who was severely injured and unresponsive. Craft went inside, where he found Dabbs and Chambers. Upon entering the house, Craft testified that he smelled cleaning agents. When Craft asked about the smell, Dabbs said that he cleaned the area where L.T. was found. Chambers corroborated this statement by Dabbs. When Craft inquired about L.T.'s injuries, Dabbs said that he was heading to the kitchen from his bedroom and found L.T. on the floor in the hallway.

¶3. L.T. was transported to the University of Mississippi Medical Center (UMMC), where she died. According to Dr. Mark LeVaughn, L.T. died from "multiple blunt trauma [injuries] due to a beating." L.T.'s injuries included numerous impact injuries to her head, multiple blunt injuries to her face, bruising all over her body, scars, fractured ribs, a lung contusion, pelvic hemorrhaging, and a large ring-shaped patterned bruise on her rear. L.T.'s right arm had defense patterns, and the soft tissue in her lower back contained a large amount of blood.

2

¶4.    Sergeant Christian Vance testified that he went to the hospital and saw L.T.'s injuries. He then went to Chambers's home and arrested Chambers and Dabbs. While arresting them, Vance noticed that the other two children were in distress. He saw A.C., who was twelve, wincing in pain, and another officer observed bruises on D.C., who was fourteen. The two minor children were transported to UMMC for further evaluation.

## A.    Investigation and Waiver of *Miranda* Rights

¶5.    Homicide Detective Kevin McNeal interrogated Dabbs and Chambers separately at the Jackson Police Department on the night of L.T.'s death. Dabbs stated that L.T. had lost bowel function, which was the reason that he and Chambers were cleaning when Craft arrived. However, Dabbs later confessed to police that he would often beat the children with a belt, leaving marks. Dabbs also admitted that Chambers knew that he would snap and challenged her to "try and stop [him]." Dabbs told police that he did not know his own strength, which is why he kept hurting them. Dabbs also told McNeal that Chambers had mental problems, but she was not directly involved in the abuse. Dabbs explained that he would turn on the radio and beat the children when Chambers would go outside. Dabbs admitted that a similar sequence of events happened the night L.T. died. He "snapped," and although Chambers was outside, when she came back in the house, Dabbs told her that he hit L.T. and he did not know if she was alright. Dabbs continued in his statement that Chambers never touched the children, but she also would not tell authorities that Dabbs was the one who hurt them.

¶6.    McNeal also interrogated Chambers. Detective Martha Dees was also present.

McNeal read Chambers her *Miranda* rights.[2] When McNeal asked Chambers if she wanted to waive her *Miranda* rights, Chambers initially began rambling about what happened at the house, but McNeal immediately stopped her and prompted her to answer. Initially, Chambers said "no," explaining that "I'm kinda mental so you gotta . . . I'm kinda mental in the head." McNeal clarified that he wanted to ask her some questions and talk about what happened. Chambers again began talking, and McNeal stopped her, stating that he needed her permission to ask questions about what happened, asking her to answer yes or no. Chambers answered "yes." McNeal continued the interrogation, including reading over her *Miranda* waiver form. After explaining the form to Chambers, McNeal asked if she understood it and asked for her signature. Chambers looked over the form for several seconds but did not sign it. Instead, she asked what would happen if she did not sign it. McNeal responded:

> Even if we don't talk to you tonight, we are going to have to talk to you eventually. We are going to have to talk to you . . . in this setting because . . . [there's] some questions that we need answering, and [there's] some information that we need, and we think that you would be the best one to help us out with that. But . . . if you don't feel comfortable talking . . . .

Chambers interrupted McNeal and reiterated that she had a mental disorder and that she was hungry and thirsty. McNeal asked if she wanted to wait and talk, and Chambers answered "yes." McNeal then told Chambers that he was not going to ask her any more questions, and he said he was going to "cut" the interview so Chambers could "get some nourishment."

¶7. Chambers was aware that the interview had ended and asked McNeal if he had her phone number so he could call her. However, as shown in the interrogation video, Chambers

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

suddenly initiated a conversation with McNeal without being prompted by any questioning. Chambers told McNeal that L.T. slipped and fell in the hallway. Chambers repeatedly denied that Dabbs ever laid a hand on her children. Chambers also said that A.C. and D.C. sustained their injuries during fights with other children. Chambers was then arrested and charged with capital murder and felony child abuse.

### B. Mental Health Evaluation and Indictment

¶8. Chambers was held in detention after the court refused to grant bond. Chambers was then evaluated pursuant to the County Court's order to determine her competency to stand trial. Dr. R.M. Storer conducted an evaluation and reported his findings to the court.

¶9. During his evaluation, Storer learned that Chambers had an Individualized Education Plan (IEP) during the ninth grade. Chambers also dropped out of the ninth grade due to the birth of L.T. However, Chambers obtained a high school diploma through an online Christian school. Chambers also visited Hinds Behavioral Health Center at the request of the Department of Human Services (DHS) on two separate occasions. The first was in 2013 when DHS required an evaluation to determine if she was capable of being the payee of her children's disability checks, not for any mental health concerns for herself. DHS also required Chambers to seek an evaluation of her mental health at Hinds Behavioral Health in 2014 when she lost custody of her children.[3] Although Chambers was diagnosed with "[a]djustment disorder due to losing her children to DHS," none of the records from Chambers's 2013 and 2014 visits indicated a diagnosis of mental illness.

---

[3] Our record does not indicate a reason for the children's removal, but they were obviously placed back into the home.

¶10. Over the course of Storer's evaluation, Chambers was "essentially uncooperative in that she was feigning memory deficits, and exaggerating and/or fabricating psychological symptoms." He opined that Chambers demonstrated a good factual and rational understanding of the legal proceedings. But when Chambers was asked about them in formal evaluations, Chambers "stated that she did not know, did not remember, or began complaining about physical and/or psychological symptoms." Ultimately, Storer opined that despite Chambers's lack of cooperation, depressive symptoms, and "likely intellectual deficits," Chambers had "a rational and factual understanding of the nature and object of the proceedings pending against her, and she does have the ability to consult with counsel with a reasonable degree of rational understanding."

¶11. On February 22, 2021, a grand jury returned a three-count indictment against Chambers, charging her with capital murder and two counts of felony child abuse while aiding and abetting Dabbs.[4]

### C. Chambers's Motion to Suppress

¶12. Before trial, Chambers filed a motion to suppress the statements she made to McNeal, arguing that she never waived her *Miranda* rights. She claimed that McNeal lied to her about her Fifth Amendment rights by telling her that she would "eventually" have to talk to law enforcement. Therefore, Chambers argued that she was never fully informed of her right to remain silent. As a result, she contended that her Fifth Amendment rights were violated because she did not understand them and that McNeal did not "cure her misunderstandings."

---

[4] Chambers and Dabbs were tried separately. Chambers is the sole appellant in this matter.

¶13. At a pretrial hearing on the motion, Chambers and McNeal testified. Although the recording of her interview showed that Chambers was read her *Miranda* rights, Chambers testified that her rights were not read to her and that she did not understand that she had the right to remain silent. When asked if she had ever been diagnosed with a mental issue or learning disability, Chambers testified that only her mom knew of her learning disability. McNeal testified that when Chambers mentioned that she had a learning deficit, he read Chambers's rights slowly to make sure she understood.

¶14. The trial court concluded that McNeal's misrepresentation to Chambers that she would "eventually" have to talk to law enforcement was improper. However, the trial court found that Chambers's statements to McNeal were admissible because Chambers ultimately initiated another conversation and because those statements were not a result of direct questioning from law enforcement.[5] The court explained:

> Detective McNeal stated, "We are going to discontinue the interrogation." It even went so far as Ms. Chambers saying you have my number to contact me at. Now that should have been the end of it.
>
> Had Detective McNeal then began initiating additional questions, then I would say that the defendant has a viable argument from that point. But Detective McNeal didn't ask any additional questions after he said we are going to cease the interrogation. The defendant started talking without any coaxing from Detective McNeal. She initiated whatever was said at that point. So as it relates to what was said after he said . . . that the interview was going to . . . cease at that point and the defendant started talking without any coaxing from Detective McNeal. That's coming in until the end of that interview.

---

[5] The trial court did, however, suppress a second interview conducted by Detective John Neal. Neal attempted to start another interview and stated his intention to read Chambers her *Miranda* rights again, but he did not. The trial court ruled that law enforcement should have ensured that Chambers understood her rights before starting a new line of questioning.

**D.    Trial**

¶15.    On April 13, 2023, a four-day trial began. Craft, Vance, Dr. LeVaughn, and McNeal testified to the facts discovered above. The State introduced Chambers's interview during McNeal's testimony. Chambers objected, raising the same argument that she made in her motion to suppress. The trial court overruled the objection and admitted the statement. The State played the video recordings of both Chambers's and Dabbs's interrogations for the jury.[6]

¶16.    After the video interrogations were played, McNeal testified that he arrived at Chambers's house after first responders had taken L.T. to UMMC. When he arrived, he noticed dark curtains draped over the back door. McNeal also observed that the master bedroom was fully furnished, while the bedrooms where the children slept contained only a mattress, box spring, and sheets. The other bedrooms also had locks and hooks on the outside of the doors. In the kitchen, McNeal found that the cabinet doors and the cereal boxes had duct tape on them. The back door that led into the backyard was also covered in duct tape. He further noticed that the front of the house was very clean, while the back of the house was in complete disarray, with broken furniture and holes in the walls.

---

[6] Dabbs did not testify, and his statement normally would be inadmissible hearsay. MRE 801(b)(2). But Chambers's counsel filed a pre-trial motion to declare Dabbs unavailable. In the same motion, Chambers notified the trial court of her intent to offer Dabbs's recorded statement into evidence. Chambers argued that the jury would benefit from hearing the statement. She argued that hearing from all of the parties that were present at Chambers's house on the night of L.T.'s death would "undoubtedly serve" the "interests of justice." The court granted the motion with no objection from the State. When the State presented its case and introduced the video of Dabbs's statement into evidence, Chambers did not object, and Dabbs's statement was entered into evidence.

8

¶17. Dr. Rosalyn Brownlee, a pediatrician at the UMMC Children's Safe Center who examined A.C. and D.C. on the night of L.T.'s death, testified next. She related that D.C., who was fourteen, had an abrasion across his face, a scar on his neck, and an injury near his collarbone. X-rays also revealed that D.C. had a previous rib fracture. D.C. was admitted into the pediatric intensive care unit, where he stayed for three days. Brownlee also noticed bruises that were healing from D.C. being hit repeatedly with a "long flexible object." Brownlee testified that A.C., who was twelve at the time of L.T.'s death, had a broken nose, bruising under the eye, and a small scar on her forehead. She had scars and bruising across her arm and bruises on her lower leg, buttocks, and back. A.C. and D.C. both had elevated creatinine levels and rib fractures, which Brownlee believed to be a sign of rhabdomyolysis.[7] Brownlee concluded that A.C. and D.C. had been abused. Lastly, Brownlee stated that A.C. and D.C.'s visit to UMMC was not their first. She testified that the two had visited UMMC in 2013, 2017, and on two separate occasions in 2020. In 2013, D.C. was treated for injuries that were suggestive of inflicted injury and physical abuse. Chambers did not cross-examine Brownlee.

¶18. Lastly, Dr. LeVaughn testified about his findings related to L.T.'s autopsy. He testified that the blunt trauma resulted in massive soft tissue hemorrhages and hematoma formation, a subarachnoid hemorrhage, rib fractures, lung contusions, a posterior pharyngeal

---

[7] Rhabdomyolysis is a serious medical condition that occurs when muscle tissue gets severely damaged and substances from inside of the muscle cells leak out into the bloodstream. This is caused by a direct or indirect muscle injury. Rhabdomyolysis can lead to serious complications, even death. John M. Sauret et al., *Rhabdomyolysis*, American Family Physician (Mar. 1, 2022), https://www.aafp.org/pubs/afp/issues/2002/0301 /p907.html.

9

hemorrhage, a pelvic soft tissue hemorrhage, and a Mesenteric hemorrhage. In addition to the injuries L.T. sustained on the night of her death, Dr. LeVaughn also discovered "prior or remote blunt injuries evidenced by healing abrasions, scar[ing], [a] healed left humerus fracture, and a healing rib fracture." The State asked if it was possible L.T. died because of anything other than a beating:

Q. Would it be possible that this child died because she slipped and fell?

A. In my opinion, absolutely not.

Q. Or as a result of some neighborhood fight?

A. In my opinion, absolutely not.

Chambers did not cross-examine Dr. LeVaughn.

¶19. After the State rested, Chambers moved for a directed verdict, arguing the State failed to prove capital murder or either count of felony child abuse. The trial court denied Chambers's motion, finding sufficient evidence was presented to the jury. Chambers did not testify or call any witnesses.

¶20. The jury found Chambers guilty of all three counts, and the circuit court sentenced her to life imprisonment without eligibility for parole for the murder of L.T. and to serve ten years for each count of felonious child abuse of the other two children. The court ordered the two sentences for felony child abuse to run consecutively to each other.

¶21. On April 18, 2023, Chambers filed an unsuccessful motion for a judgment notwithstanding the verdict or a new trial. On appeal, Chambers contends that the Jackson Police Department created a "coercive atmosphere" when McNeal lied to her about her right

10

to remain silent. She further argues that because her statement was coerced, the trial court committed reversible error when it denied her motion to suppress. Chambers also argues that the State presented insufficient evidence to convict her of capital murder and the two counts of felony child abuse, claiming that the State's case rests "purely on speculation and not actual evidence." Therefore, Chambers reasons that this Court should reverse her convictions.

¶22. The State argues that Chambers's claims lack merit because she voluntarily initiated her statements to law enforcement when she spontaneously began talking after McNeal ended the interview and when she waived her *Miranda* rights by willingly participating in a discussion with the detectives. Even if the trial court erred by admitting the statement, the State contends that any error was harmless, and this Court should affirm Chambers's convictions.

### STANDARD OF REVIEW

¶23. "This court will reverse a trial court's denial of a motion to suppress only if the ruling is manifest error or contrary to the overwhelming weight of the evidence." *Saddler v. State*, 297 So. 3d 234, 237 (¶6) (Miss. 2020) (quoting *Barnes v. State*, 30 So. 3d 313, 316 (¶8) (Miss. 2010)). "Once a trial judge determines admissibility, the defendant/appellant faces a heavy burden in trying to reverse on appeal." *Id.* (quoting *Ruffin v. State*, 992 So. 2d 1165, 1169 (¶8) (Miss. 2008)).

¶24. "In reviewing a challenge to the sufficiency of the evidence for a criminal conviction, we view all evidence in the light most favorable to the State." *Hampton v. State*, 309 So, 3d

11

1055, 1061 (¶32) (Miss. 2021) (internal quotation mark omitted) (quoting *Thomas v. State*, 277 So. 3d 532, 535 (¶11) (Miss. 2019)). We will reverse and render judgment favoring the appellant "only if the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Id*. (internal quotation marks omitted) (quoting *Young v. State*, 119 So. 3d 309, 315 (¶18) (Miss. 2013)).

## DISCUSSION

I.     **Whether the trial court erred when it failed to suppress Chambers's statement.**

¶25.    The Fifth Amendment's prohibition against compelled self-incrimination, as applied through the Fourteenth Amendment, requires that "[a] suspect must 'be advised of his right to remain silent and his right to counsel before any custodial interrogation.'" *Piccaluga v. State*, 337 So. 3d 1142, 1152 (¶42) (Miss. Ct. App. 2021) (quoting *Jordan v. State*, 995 So. 2d 94, 106 (¶30) (Miss. 2008)). However, after a suspect has been advised of these rights, the suspect may waive them and respond to interrogation. *Id.* The trial court must determine a waiver's validity based on the totality of the circumstance. *Roberts v. State*, 234 So. 3d 1251, 1260 (¶23) (Miss. 2017). Further, our Supreme Court has also held that "there is no requirement that a valid waiver must be in writing and signed for an incriminating statement to be admissible." *Ruffin*, 992 So. 2d at 1171 (¶16) (citing *Armstead v. State*, 978 So. 2d 642, 648 (¶28) (Miss. 2008)). Waiver of the constitutional right to remain silent must be "voluntary, knowing and intelligent." *Moore v. State*, 287 So. 3d 905, 912 (¶21) (Miss. 2019) (citing *Miranda*, 384 U.S. at 444).

12

### A. Voluntary Waiver

¶26. "Waiver is considered voluntary if it is the result of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (internal quotation marks omitted). A statement is free and voluntary if the suspect in custody initiates a conversation with law enforcement. *Dean v. State*, 305 So. 3d 1200, 1206 (¶14) (Miss. Ct. App. 2020). On appeal, Chambers focuses her entire argument on the details of her interrogation and McNeal's assertion that she would "eventually" have to speak to law enforcement, critiquing McNeal's "cavalier" approach to her *Miranda* rights. Chambers contends that her statements to McNeal were not voluntary because McNeal created a "coercive environment" that induced her to speak. However, Chambers's argument fails to address the fact that McNeal ended the interview before she made any statement to law enforcement.

¶27. The trial court specifically found:

> The defendant started talking without any coaxing from Detective McNeal. She initiated whatever was said at that point. So as it relates to what was said after he said . . . that the interview was going to . . . cease at that point and the defendant started talking without any coaxing from Detective McNeal. That's coming in until the end of that interview.

¶28. "The initiation of questioning of the suspect who is in custody by law enforcement officers triggers the need for *Miranda*; therefore, if a suspect in custody initiates the conversation, that statement may be admissible as freely and voluntarily given even without prior *Miranda* warnings." *Id.* (quoting *Alexander v. State*, 736 So. 2d 1058, 1063 (¶11) (Miss. Ct. App. 1999)). "Voluntary statements are not barred by the Fifth Amendment[,] and their admissibility is not affected by the *Miranda* decision." *Id.* (quoting *Stevenson v. State*,

13

244 So. 2d 30, 33 (Miss. 1971)). For example, in *Alexander*, Alexander was arrested for possession of marijuana and read his *Miranda* rights while he was in custody. *Alexander*, 736 So. 2d at 1060 (¶3). During booking, Alexander made incriminating statements about his involvement. *Id*. The trial court denied Alexander's motion to suppress the statements, and he was convicted of possession of marijuana with the intent to sell. *Id*. at 1061 (¶5). This Court affirmed the denial of Alexander's motion to suppress because

> [t]he officers testified and the defendant agreed that *Miranda* warnings were given to Alexander when he was arrested. After Alexander was in custody and taken to the station house for booking, he made incriminating statements regarding his drug supplier which were unsolicited and voluntary. Alexander was not being subjected to "interrogation" even though he was "in custody." *Luster v. State*, 515 So. 2d 1177, 1179 (Miss. 1987).

*Id*. at 1063 (¶12).

¶29. Here, McNeal repeatedly stopped Chambers from discussing the events leading up to L.T.'s death until she was given her *Miranda* rights. His questions before Chambers spoke spontaneously only concerned whether Chambers consented to the conversation by waiving her *Miranda* rights. McNeal did not discuss what happened at Chambers's house that night until Chambers initiated it.

¶30. Additionally, McNeal read Chambers her *Miranda* rights, which she acknowledged by initialing a section indicating that she understood them, but she did not sign the waiver portion of that one-page document. McNeal then asked Chambers multiple times if she would like to talk about the events that led to L.T.'s death. After stating multiple times that she was tired, hungry, and could not focus, Chambers stated that she wanted to talk later. McNeal understood that Chambers did not want to talk at the moment, and he proceeded to

14

collect her contact information. The video recording reveals that McNeal ended the interview. Chambers understood that she was about to leave, as she nodded her head affirmatively several times. She also verbally confirmed that McNeal's plan was to call her later. At that moment, Chambers was no longer subjected to interrogation because McNeal had ended the interview. Then Chambers started speaking without prompting from McNeal. As in *Alexander*, there is a clear indication that Chambers understood her rights and that her statement, like Alexander's, was spontaneous and voluntary.

### B. Knowing and Intelligent Waiver

¶31. "[A] waiver is knowing and intelligent if it is made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Brown v. State*, 130 So. 3d 1074, 1079 (¶11) (Miss. 2013) (internal quotations marks omitted) (quoting *Coverson v. State*, 617 So. 2d 642, 646 (Miss. 1993)). Chambers contends that because of her mental incapacity, she could not have knowingly and intelligently waived her Fifth Amendment rights. However, "the mental abilities of an accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made." *Moore*, 287 So. 3d at 912 (¶21). The Mississippi Supreme Court has held that under a totality of the circumstances review, the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights despite being seventeen, having a low IQ, and presenting testimony that he read at a fourth-grade level. *McGowan v. State*, 706 So. 2d 231, 238 (¶29) (Miss. 1997).

¶32. In the case at hand, at the suppression hearing, Chambers testified that she had a

"mental disability." Her court-ordered mental evaluation reflects that Chambers had an IEP in high school. She dropped out of school in the ninth grade due to the birth of her first child. But she later obtained her high school diploma. As an adult, Chambers did not drive anywhere, but she otherwise functioned as an adult. Further, no other documents or records in her adult life suggested that Chambers had a mental disability so severe that she was unable to waive her *Miranda* rights. Although Chambers was generally uncooperative and often feigned memory problems, Dr. Storer opined that she had the ability to understand the nature of the proceedings and consult with counsel "with a reasonable degree of rational understanding." Chambers's mental deficiencies, if any, did not rise to the level of the mental disability discussed in *McGowan*. Even in *McGowan*, the defendant was found competent with far more mental deficiencies. *Id*. at (¶¶29-31).

¶33. Accordingly, we find that Chambers initiated a conversation with law enforcement and voluntarily, knowingly, and intelligently waived her *Miranda* rights. The trial court did not err in denying Chambers's motion to suppress her statement.

## II. Whether the State presented sufficient evidence to convict Chambers of felony child abuse and capital murder.

¶34. Chambers argues that the evidence presented was insufficient to support her convictions. We must affirm challenges to the sufficiency of the evidence "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Thomas*, 277 So. 3d at 535 (¶11) (internal quotation mark omitted) (quoting *Cotton v. State*, 144 So. 3d 137, 142 (¶9) (Miss. 2014)).

¶35. Chambers was indicted for acting in concert or aiding and abetting Dabbs in capital

16

murder and felonious child abuse in violation of Mississippi Code Annotated sections 97-3-19 (Rev. 2020) and 97-5-39(2) (Rev. 2020).[8]

_____

[8] The elements for capital murder are found in section 97-3-19(2), where it states:

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
. . . .

> (f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony.

Felonious child abuse is defined in section 97-5-39(2), which provides:

(2) Any person shall be guilty of felonious child abuse in the following circumstances:
> (a) Whether bodily harm results or not, if the person shall intentionally, knowingly or recklessly:
> > (i) Burn any child;
> > (ii) Torture any child;
> > (iii) Strangle, choke, smother or in any way interfere with any child's breathing;
> > (iv) Poison a child;
> > (v) Starve a child of nourishments needed to sustain life or growth;
> > (vi) Use any type of deadly weapon upon any child;
>
> (b) If some bodily harm to any child actually occurs, and if the person shall intentionally, knowingly or recklessly:
> > (i) Throw, kick, bite, or cut any child;
> > (ii) Strike a child under the age of fourteen (14) about the face or head with a closed fist;
> > (iii) Strike a child under the age of five (5) in the face or head;
> > (iv) Kick, bite, cut or strike a child's genitals; circumcision of a male child is not a violation under this subparagraph (iv);
>
> (c) If serious bodily harm to any child actually occurs, and if the person

17

¶36. "One who aids and abets another in the commission of a crime is guilty as a principal." *Hampton*, 309 So. 3d at 1064 (¶48) (quoting *Hughes v. State*, 983 So. 2d 270, 276 (¶14) (Miss. 2008)).

> Aiding and abetting is defined to be the offense committed by those persons who, although not the direct perpetrators of a crime, are yet present at its commission, doing some act to render aid to the actual perpetrator. And such aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition.

*Bryant v. State*, 319 So. 3d 1208, 1211 (¶12) (Miss. Ct. App. 2021) (quoting *Lynch v. State*, 877 So. 2d 1254, 1279 (¶79) (Miss. 2004)).

¶37. Chambers claims that Dabbs was the one who abused the children. She further notes that he repeatedly told law enforcement that she had nothing to do with the abuse. The State, however, argues that there is ample evidence to show that Chambers approved of Dabbs's actions and that her own acts of omission satisfied the requirements of the felony child abuse statute.

¶38. At trial, the jury heard both Dabbs's and Chambers's statements to law enforcement. The jury heard Dabbs admit to abusing the children. They also heard Dabbs mention that he

---

shall intentionally, knowingly or recklessly:
    (i) Strike any child on the face or head;
    (ii) Disfigure or scar any child;
    (iii) Whip, strike or otherwise abuse any child;

(Rev. 2024). Subsection 97-5-39(2)(f) also defines "serious bodily harm" as including, but not limited to "the fracture of a bone, permanent disfigurement, permanent scarring, or any internal bleeding or internal trauma to any organ, any brain damage, any injury to the eye or ear of a child or other vital organ, and impairment of any bodily function."

18

would dare Chambers to "try and stop him." Dabbs also said that Chambers would not tell law enforcement that he (Dabbs) was the one who hurt the children.

¶39. Just as Dabbs predicted, even in this case, Chambers did not tell the authorities that Dabbs beat the children. Instead, Chambers maintained that L.T. slipped in water and that A.C.'s and D.C.'s injuries resulted from fights at school. The jury heard Dabbs's and Chambers's interrogations and could conclude that Chambers was attempting to cover for Dabbs. Additionally, the jury heard McNeal testify about the conditions he found at Chambers's house: locks outside of the children's bedrooms, taped cereal boxes and cabinets, and rooms devoid of anything but mattresses and box springs.

¶40. Both Brownlee and LeVaughn testified that all three children's injuries were sustained over a long period of time, including two prior visits to UMMC, when A.C. and D.C. had injuries suggesting abuse. LeVaughn also adamantly testified that only abuse could cause such injuries, dispelling any notion that L.T.'s injuries resulted from slipping in water or a neighborhood fight. Viewing the evidence in the light most favorable to the State, there was ample evidence to find that Chambers unmistakably approved of her children's abuse, which ultimately aided and abetted Dabbs.

## CONCLUSION

¶41. The trial court's denial of Chambers's motion to suppress was not manifest error, and there was sufficient evidence to support her convictions. Therefore, we affirm the circuit court's judgments of conviction and sentencing.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**