# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01744-COA

SHANNON RAYNER A/K/A SHANNON L.            APPELLANT
RAYNER A/K/A SHANNON LAVELL RAYNER

v.

STATE OF MISSISSIPPI            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/29/2013 |
| TRIAL JUDGE: | HON. EDDIE H. BOWEN |
| COURT FROM WHICH APPEALED: | JASPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN M. COLETTE |
| | SHERWOOD ALEXANDER COLETTE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | DANIEL CHRISTOPHER JONES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF DELIBERATE-DESIGN MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 08/11/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., ISHEE AND CARLTON, JJ.

### CARLTON, J., FOR THE COURT:

¶1. On February 19, 2013, a Jasper County grand jury indicted Shannon Rayner in a two-count indictment for the deliberate-design murder[1] of his wife, Sonya Hunt Rayner, and

---

[1] Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014).

arson.[2] After a jury trial, Rayner was acquitted of the arson charge, but convicted of murder and sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). After the denial of his post-trial motions, Rayner filed this appeal, asserting the following issues for appellate review: (1) whether the trial court erred in denying his motion for a judgment of acquittal; (2) whether the trial court erred in denying his motion for a judgment notwithstanding the verdict (JNOV); (3) whether the trial court erred in denying his motion for a mistrial; and (4) whether he was denied his Sixth Amendment right to a fair and impartial trial due to the prosecutor's allegedly improper and prejudicial remarks regarding the credibility of expert witness Dr. Steven Hayne. Upon finding no reversible error, we affirm the trial court's judgment of conviction.

## FACTS

¶2. During the early morning hours of February 15, 2011, a fire engulfed a deer camp owned by Rayner and his wife, Sonya. Rayner escaped the blaze, but the firemen found Sonya's body in the bedroom. Sonya's autopsy and the following investigation concluded that her death was a homicide and that she died from blunt-force trauma. At trial, the jury acquitted Rayner of arson but found him guilty of deliberate-design murder. The testimony at trial focused on evidence regarding the cause and manner of Sonya's death. Our recitation of the facts herein begins with the morning before Rayner and Sonya traveled to the deer camp.

---

[2] Miss. Code Ann. § 97-17-1(1) (Rev. 2014).

¶3. On February 14, 2011, Rayner and Sonya visited the BankPlus in Ridgeland, Mississippi. Jadrienne Cowan, an employee of that BankPlus location, testified that she assisted the couple that day. Cowan testified that Rayner and Sonya wanted to take Sonya's name off of a joint account. Cowan explained that due to bank policy, they could not remove Sonya's name from the account without closing it, so they opened a new account in Sonya's name and left the other account alone. Sonya deposited $100 into the account. Cowan testified that during her interaction with Rayner and Sonya, Rayner seemed agitated with Sonya, telling Sonya, "this is what you wanted." Cowan testified that Sonya seemed nervous. Cowan observed the couple have a "heated" argument in the bank parking lot, and she watched Sonya walk off.

¶4. According to Rayner, he and Sonya then decided to travel from Jackson, Mississippi, down to Rayner's deer camp located in Bay Springs, Mississippi. Rayner and Sonya planned to stay at the camp for only one night, so they did not pack any clothes. Once Rayner and Sonya arrived in Bay Springs, they stopped to eat at Hardee's. After finishing their meal, Rayner and Sonya drove to Laurel, Mississippi, and purchased some alcoholic beverages from Northside Package, where Margaret Rogers worked as the sales clerk. Rayner and Sonya then stopped at a Fred's store to buy DVDs to watch that night. After they arrived back at the deer camp, Rayner and Sonya mixed a few alcoholic beverages and watched movies. Rayner and Sonya watched one movie, then went to the bedroom and eventually went to sleep.

3

¶5.    Rayner told investigators that sometime during the night or early morning hours of February 15, 2011,[3] he woke up to find Sonya standing naked at the foot of the bed and "physically struggling with something." Rayner realized the bedroom was filled with smoke. Rayner attempted to stand up, but testified that he was knocked to his hands and knees by the smoke, so he crawled toward the bedroom door. As Rayner opened the bedroom door, the heat and black smoke rolled in, and he yelled to Sonya that they needed to get out of the house.

¶6.    Rayner stated that he did not know or remember how he got out of the house, only that he woke up in the yard naked, with his right shoulder and ribs burning. Rayner then noticed the house fully engulfed in flames and that he was alone, and could not find Sonya. The firemen on scene dragged Rayner across the road to a safe location where he was eventually treated by paramedics.

¶7.    Fire Chief Tommy Boyd, who also served as a deputy for the Jasper County Sheriff's Department at the time, arrived on the scene of the fire approximately thirty to forty minutes after being notified. Chief Boyd observed Rayner sitting in the back of an ambulance, and then later sitting on the tailgate of a truck. Chief Boyd testified that Rayner did not appear to be coughing or suffering symptoms of smoke inhalation, nor did he appear to be injured,

---

[3] Ken Carraway, a former law enforcement officer at the State Fire Marshall's Office, testified that he and other law enforcement officers interviewed Rayner on February 17, 2011, two days after the fire. Carraway read Rayner's statement from the interview to the jury.

burned, or have singed hair.

¶8.     Once the fire was contained, Chief Boyd entered the house to search for Sonya. Chief Boyd found Sonya's body in the bedroom near a pile of sheetrock and insulation. Chief Boyd testified that the roof over Sonya's body remained intact, and confirmed that no heavy objects lay in the vicinity of the body. After removing Sonya's body from the house, the body was sent to the Mississippi Crime Lab's chief medical examiner's office.

¶9.     Chief Boyd also testified that he found a large area of blood on the mattress where he found Sonya's body. After removing Sonya's body, Chief Boyd discovered that the blood had soaked through the cotton mattress, the carpet and the carpet padding, as well as onto the wood subflooring. Chief Boyd testified, "I have worked a lot of fire deaths. I have never found this much blood from a fire . . . . [A] fire burning a body usually does not make a body bleed like this. Fires seal arteries."

¶10.    On February 19, 2013, a Jasper County grand jury indicted Rayner on one count of deliberate-design murder and one count of arson. On August 26, 2013, Rayner began a three-day trial wherein the State called nine witnesses: Jadreinne Cowan, Tommy Boyd, Kathryn Rogers, James Vickers, Margaret Rogers, Dr. Mark LeVaughn, Ken Caraway, Sara Jernigan, and Tiara Smith.

¶11.    Kathryn Rodgers, a DNA analyst for Scales Biological Laboratory, was allowed to testify as an expert in the field of DNA testing and analysis. Rodgers testified that she received seven items from the Jasper County Sheriff's Department to test for the presence of

5

DNA. Of the seven items, only three items were tested: a sample of carpet, a sample of carpet padding, and buccal swabs (Rodgers explained that a buccal swab constitutes a method of collecting cells from the inside of a person's mouth with a cotton swab) of Linda Hunt, Sonya's mother. Rodgers testified that test results confirmed that Linda Hunt was the mother of the person whose blood was found in the carpet; in other words, the blood found in the carpet was Sonya's blood. Rodgers explained that the remaining items, including the Maglite flashlight, were not tested because those particular items were not sealed properly. Rodgers testified that it is Scales's policy to not test items that were not received under the proper chain of custody or when the seals are not intact.

¶12. James Vickers, a fire-scene investigator hired by State Farm, testified as an expert in fire origin and cause. Vickers specifically testified to the investigation and findings regarding the fire at Rayner's deer camp. Vickers testified that his investigation revealed that "an ignitable liquid was applied to at least three areas in the house—one at the west side of the den, the second at the doorway between the den and the hall, and the third in the middle of the living room on the north end." When asked by the State, "Was this fire set by human hands?" Vickers answered, "Had to be." After his investigation, Vickers concluded that the fire was caused by intentional ignition of an ignitable liquid.

¶13. Margaret Rogers, the manager of Northside Package in Laurel, confirmed that Shannon Rayner purchased alcohol totaling $89.82 from her store on February 14, 2011. However, Rogers possessed no knowledge as to which types of alcohol Rayner purchased.

Rogers testified that her store sells two alcohols that contain a warning label stating that the alcohol is flammable—Everclear and Bacardi 151 rum. When the State asked Rogers if she had ever witnessed either of those alcohols set on fire, Rogers answered that about twenty-five or thirty years ago, she witnessed Bacardi 151 rum set on fire in a drink. Rayner objected to the relevancy of her testimony, and then moved for a mistrial. Rayner argued that the prosecutor knew Rogers did not know what Rayner purchased from the liquor store on February 14, 2011, yet he called her as a witness to inflame the jury with her prejudicial testimony that she had seen Bacardi 151 set on fire twenty-five years ago. The trial court denied Rayner's motion, but instructed the jury to "disregard [Rogers's] testimony in full as though she never took the witness stand."

¶14. After the State played a jailhouse recording of Rayner and his mother, the State then called its medical examiner, Dr. Mark LeVaughn, as an expert in the fields of anatomic and forensic pathology. Rayner objected to Dr. LeVaughn's testimony as hearsay and made a motion to exclude Dr. LeVaughn's expert testimony based on the fact that Dr. LeVaughn did not perform Sonya's autopsy and was not employed at the Mississippi Medical Examiner's Office until a month after the autopsy was performed. The trial court denied Rayner's motion and allowed Dr. LeVaughn to testify as an expert in the fields of anatomical and forensic pathology. Dr. LeVaughn stated that on February 16, 2011, Dr. Adel Shaker[4] performed the

---

[4] Dr. Shaker was not available to testify at trial, as he was no longer employed by the Mississippi Medical Examiner's Office. Dr. LeVaughn, however, reviewed Dr. Shaker's autopsy report, slides, and photographs, as well as Sonya's toxicology report.

original autopsy on Sonya. Dr. LeVaughn concluded the cause of death to be "[p]robable blunt trauma, possibly with sharp force injury." When asked what type of blow to the head would have caused the fracture, however, Dr. LeVaughn concluded that he did not know, that "hundreds and thousands of different objects" could cause a blunt injury. He stated his conclusion that the manner of death was "homicide," explaining the lack of evidence of natural disease, lack of evidence of breathing of smoke and soot, and significant evidence of bleeding from a traumatic injury.

¶15. Dr. LeVaughn explained that he consulted with Dr. Shaker and reviewed multiple other pieces of evidence concerning the fire and Sonya's death. Dr. LeVaughn testified that in his opinion, the blood found on the carpet was there before the fire. Dr. LeVaughn also concluded, based on his examinations of the toxicology report and Sonya's tissues, that Sonya "was dead before the fire," explaining that he found no evidence "of any soot aspiration within the respiratory tract, and the toxicology for carbon monoxide was essentially negative." Dr. LeVaughn further testified that Sonya's toxicology report reveals that she had a blood-alcohol content of .19, and that she had "antidepressant Sertraline or Zoloft in her blood at a therapeutic, or expected, level." Dr. LeVaughn testified: "[I]n my opinion, neither [the alcohol nor the medication,] separately or combined[,] caused her death."

¶16. The State then called Ken Caraway, a law enforcement officer with the State Fire Marshall's Office, for the purpose of introducing Rayner's handwritten statement given to him by Rayner in an interview on February 17, 2011. The trial judge allowed Caraway, over

8

Rayner's objection, to read Rayner's statement aloud to the jury. Caraway stated that while interviewing Rayner, he observed no fire-related injuries on him, such as singed hair or eyebrows, or any burns. Carraway testified while Rayner may have expressed regret about losing Sonya in the written statement, Rayner did not show any emotions during the interview.

¶17. Sara Jernigan was then called to the stand to testify as to Rayner's actions on February 15, 2011, in the Madison branch of BankPlus. Jernigan testified that Rayner asked for a new debit card, and also inquired about closing Sonya's debit card and her bank account. Jernigan testified that she started feeling uneasy when she realized Sonya's account had just been opened the day before, and learned that Sonya died in a fire during the night. Jernigan stated that due to Rayner's strange behavior and his questions about closing Sonya's account, she felt very uneasy and began physically shaking by the time Rayner left the bank.

¶18. Lastly, the State called Tiara Smith, an employee at Yankee Candle in February 2011, and also Sonya's coworker. Within moments of taking the stand, Smith began to get upset. When questioned about the first time she met Rayner , Smith began sobbing and blurted out, "It's really hard to relive all of this. Sonya didn't deserve this." Rayner objected and moved for a mistrial based on the unresponsiveness to the question asked and the prejudicial nature of Smith's response that "Sonya didn't deserve this"—meaning she did not deserve to be killed. The trial court allowed Smith to try and compose herself outside the presence of the jury. The trial court then allowed the State and the defense, outside of the presence of the

9

jury, to agree on a written stipulation to read before the jury, rather than call Smith back to the witness stand. Rayner also renewed his objection to Smith's response and outburst in front of the jury. The trial court denied Rayner's motion for a mistrial and instructed the jury to disregard Smith's entire testimony. The trial court also read the stipulation to the jury, which stated: (1) Tiara Smith worked with Sonya at Yankee Candle Company at Northpark Mall in Ridgeland, Mississippi; and (2) on February 15, 2011, the day of Sonya's death, Rayner came into Yankee Candle inquiring about Sonya's life insurance policy.

¶19. Thereafter, the jury was allowed to view the scene of the fire. Once back from the scene, the State rested its case-in-chief and Rayner moved for a directed verdict. Rayner argued that the State failed to prove, beyond a reasonable doubt, that Rayner did anything to affect the death of Sonya—the State introduced no testimony or physical evidence to link Rayner to the death of Sonya or show that Rayner intended to kill Sonya. The State responded by stating that it had proven the elements of each count in its case, and that the testimony proved Rayner and Sonya were the only people in the house. The trial court denied Rayner's motion, agreeing that "this is a circumstantial[-]evidence case," but stating that "murder and arson can be proven by circumstantial evidence." The trial court also explained that it is not incumbent upon the State to prove whether or not there were others in the house; rather, "it is incumbent upon the defense to place a third person in the house."

¶20. Rayner then presented his case, calling six witnesses: J.E. Smith, S.L. Rayner, Byron DeVault, Kirby DeVault, A.K. Rosenhan, and Dr. Steven Hayne. J.E. Smith, the mayor of

Bay Springs and a former relative of Rayner through marriage, testified that he often helped perform work at the deer camp. J.E. Smith admitted that he had not been in the house in twenty-five years, but testified that at the time he worked on the house, several electrical problems existed.

¶21. S.L. Rayner, Rayner's dad, testified that he went to the deer camp three or four weeks prior to the fire. S.L. Rayner testified that the house had become run down with age through the years. He testified that the house lacked a heating and air-conditioning unit, and that many of the light fixtures and electrical outlets no longer worked.

¶22. Byron DeVault, Rayner's neighbor in Flora, Mississippi, also testified as to the faulty electrical issues at the deer camp. DeVault informed the jury that he, his wife, and his son were at the deer camp with Rayner and Sonya two weeks before the fire. DeVault testified as to the condition of the deer camp, recalling that after killing a deer, he "plugged in the flood light[,] . . . and . . . one of the receptacles in the room that we plugged it in popped." Byron's son, Kirby, also testified that he was at the deer camp two weeks before the fire with his parents, Rayner, and Sonya. Kirby testified about the flood light sparking and popping when he plugged it in to the outlet in the house. Kirby also stated that he thought Rayner and Sonya acted like any other couple, and that he did not observe them fight or argue.

¶23. A.K. Rosenhan testified for the defense as an expert in the cause of fire and origin. Rosenhan testified that he reviewed witness statements, fire reports, expert reports, and photographs of the scene, and also visited the scene of the fire two weeks prior to trial.

11

Rosenhan testified that he could not determine the cause of the fire because he inspected the scene too long after the fire.

¶24.    Rayner called Dr. Steven Hayne, a forensic pathologist, to testify and rebut Dr. LeVaughn's and Dr. Shaker's conclusions as to the cause and manner of death.  Dr. Hayne testified that he disagreed with Dr. Shaker's and Dr. LeVaughn's conclusion that the cause of death was "probable blunt[-]force trauma" or "most likely blunt[-]force trauma," explaining that they could not rule out mechanical or physical asphyxia as the cause or a contributing factor in the death.  Dr. Hayne further opined that Dr. Shaker's and Dr. LeVaughn's conclusion "[was] not a definitive statement"; that is, the conclusion was not proven to a reasonable degree of medical certainty. After reviewing Dr. Shaker's autopsy and Dr. LeVaughn's supplemental autopsy, Dr. Hayne concluded that the cause of death was due to Sonya's .191% blood-alcohol concentration and .38 micrograms to milliliters of Sertaline (Zoloft) in her system; in other words, Sonya died of a drug overdose.  Hayne also testified that he did not think the lack of soot in Sonya's airway indicated that she died before the fire. Additionally, based on the fact that there was no indication of bleeding of the brain and the protruding nature of the fracture, Dr. Hayne concluded that the fracture to Sonya's skull was due to a heat/thermal fracture, resulting in pressure being released from the cranial cavity.

¶25.    During the State's cross-examination of Dr. Hayne, the prosecutor asked Dr. Hayne: "You told me during lunch the reason you have to carry around that big notebook with you is you have to defend yourself nowadays for all the reversals you've had in the Mississippi

12

Supreme Court; is that correct?" Rayner objected to the relevancy and improper questioning of Dr. Hayne; however, the trial court overruled the objection, finding that the question related to Dr. Hayne's credibility, and allowed the prosecutor to proceed with his line of cross-examination questioning.

¶26. After presenting his case to the jury, Rayner renewed his all of his previous motions, especially for a directed verdict/judgment of acquittal. The trial court overruled Rayner's motions. During closing arguments, the State, on rebuttal, made the following comment: "Then you go to Dr. Hayne, a discredited doctor in the State of Mississippi." Rayner objected to the comment, and the trial court sustained the objection, instructing the jury to disregard the statement concerning Dr. Hayne's character.

¶27. The trial judge then instructed the jury on the law and appointed the jury foreman. Rayner objected, citing *Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995), where the Mississippi Supreme Court advised that trial judges should not appoint the jury foreman. The trial court decided that it was "probably harmless error," but withdrew its appointment of the jury foreman. The judge then instructed the jury that it must decide who will be the foreman. Nevertheless, the jury selected that same juror previously appointed by the trial judge as its foreman.

¶28. The jury found Rayner guilty of Count I, murder, and not guilty of Count II, arson; and the trial court sentenced Rayner to serve a term of life in the custody of the Mississippi Department of Corrections. On October 4, 2013, a hearing was held on Rayner's motion for

13

a JNOV, or in the alternative, for a new trial. After hearing argument from the State and Rayner, the trial court denied Rayner's motion. This appeal followed.

## DISCUSSION

### I. Whether the trial court erred in denying Rayner's motions for a judgment of acquittal and a JNOV.

¶29. Rayner argues that the trial court erred in denying his motions for a judgment of acquittal and a JNOV.[5] Rayner argues that the evidence, even viewed in the light most favorable to the State, was insufficient for any rational trier of fact to find him guilty of deliberate-design murder. *See Nelson v. State*, 850 So. 2d 201, 205 (¶10) (Miss. Ct. App. 2003).

¶30. In considering motions for acquittal and a JNOV, the trial court "must view the evidence in the light most favorable to upholding the verdict, giving the prosecution the benefit of all favorable inferences which may be reasonably drawn from the evidence." *Id*. at (¶11) (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)). In *Nelson*, this Court recognized that "[t]he [trial] court is obligated to reverse a conviction and render a judgment of acquittal when it determines that, viewed in that light, the State's evidence as to one or more of the critical elements of the crime is so lacking that reasonable jurors could not have found [the] appellant guilty." *Id*. We further recognize that "[i]f the trial court denies the motions and that denial is raised as an issue on appeal, this Court is charged to review the

---

[5] The record shows that after the defense rested, Rayner renewed his motion for a judgment of acquittal. Rayner also filed a post-trial motion for a JNOV.

evidence by the same standard to determine whether the trial court erred in so ruling." *Id*. We now turn to address Rayner's argument that the evidence presented at trial was insufficient to convict him of deliberate-design murder.

¶31.    Rayner asserts that the State failed to prove the essential elements of deliberate-design murder. Rayner argues that the State's case was based entirely upon circumstantial evidence, and thus the State failed to prove each required element beyond a reasonable doubt. Rayner submits that the record is completely devoid of any evidence or inferences drawn therefrom establishing that Rayner did anything or set in motion any object that caused or contributed to Sonya's death. Rayner further claims that not one piece of evidence or testimony exists linking him to any object that was used, or may have been used, to effect the death of Sonya.

¶32.    The supreme court has held that "[w]hen the State's case is based entirely upon circumstantial evidence the State is required to prove the defendant guilty not only beyond a reasonable doubt but to the exclusion of every reasonable hypothesis consistent with innocence." *Cotton v. State*, 144 So. 3d 137, 140 (¶3) (Miss. 2014) (citing *Montgomery v. State*, 515 So. 2d 845, 848 (Miss. 1987)). However, "[c]ircumstantial evidence need not exclude every possible doubt but only every other reasonable hypothesis of innocence." *Id*. The *Cotton* court cautioned:

> A mere fanciful or farfetched or unreasonable hypothesis of innocence is not sufficient to require an acquittal. . . . When reviewing a jury verdict of guilty we are required to accept as true all the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such will support a verdict of guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis

15

consistent with innocence, then the jury verdict shall not be disturbed.

*Id.*

¶33.    Section 97-3-19(1)(a) defines deliberate-design murder as: "The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:  (a) When done with deliberate design to effect the death of the person killed, or of any human being[.]"  In the recent case of *Reith v. State*, 135 So. 3d 862, 865 (¶7) (Miss. 2014) (citing *Williams v. State*, 111 So. 3d 620, 623 (Miss. 2013)_, the supreme court explained that "[d]eliberate design connotes an intent to kill.  Thus, intent [is] an essential element of the crime[.]"  The supreme court further stated that "intent is an essential element of deliberate-design murder, [and] its existence is a question of fact which must be submitted to the jury."  *Id.* at (¶8).

¶34.    With respect to Sonya's death, Rayner alleges that the only evidence came from the testimony of Dr. LeVaughn, and Rayner asserts that even Dr. LeVaughn could not, without certainty, rule out mechanical or positional asphyxia as the cause or contributing factor in Sonya's death.  Rayner also asserts that a reasonable hypothesis consistent with innocence existed.  Specifically, Rayner claims that the State presented no evidence upon which a rational trier of fact could conclusively find that the light fixture in the home did not fall from the ceiling and cause Sonya's head injury.  Rayner maintains that, at most, the evidence viewed in the light most favorable to the State proves that (1) Sonya died, (2) "most likely" or probably from blunt-force trauma, but (3) her death could have resulted from mechanical

16

or positional asphyxia or a combination thereof.

¶35.    Rayner cites to *Wright v. State*, 236 So. 2d 408, 413 (Miss. 1970),[6] in support of his argument that the State failed to prove "an evil intention." Rayner maintains that not even an inference of evil intention can be raised in this case because the State failed to present any evidence that Rayner intentionally used any instrument in any manner calculated to produce Sonya's death or serious bodily injury. *See Jones v. State*, 710 So. 2d 870, 878 (¶35) (Miss. 1998).

¶36.    In contrast to Rayner's arguments, the State asserts that the evidence was sufficient to support the jury's verdict. In support of the verdict and conviction, Dr. LeVaughn testified that Sonya's cause of death was a "homicide" caused by "[p]robable blunt trauma, possibly with sharp force injury." He explained that he found no evidence of soot or smoke in Sonya's respiratory tract. Dr. LeVaughn also testified as to his opinion that the blood found on the carpet was there before the fire. Dr. LeVaughn further testified that although Sonya's toxicology report revealed that she drank alcohol and consumed antidepressants prior to her death, the drugs were "in her blood at a therapeutic, or expected, level." Dr. LeVaughn further explained that "in [his] opinion, neither [the alcohol nor the medication] separately or combined[,] caused her death."

¶37.    With respect to motive and marital discord, the jury heard the testimony of two bank

---

[6]    "It is contended that under the common law a crime requires two elements: (1) an act, and (2) an evil intention." *Wright v. State*, 236 So. 2d 408, 413 (Miss. 1970).

17

employees. Jadrienne Cowan testified that on the morning of February 14, 2011, Rayner and Sonya came into BankPlus. Cowan observed that Rayner seemed agitated with Sonya, and Sonya seemed nervous. Cowan also observed the couple have a "heated" argument in the bank parking lot, and she watched Sonya walk off. Sara Jernigan testified that on February 15, 2011, Rayner entered the bank and inquired about closing Sonya's debit card and her bank account. Jernigan stated that Rayner informed her that Sonya had died during the night, and that based on this information, as well as Rayner's strange behavior and his questions about closing Sonya's account, she felt very uneasy and began physically shaking by the time Rayner left the bank.

¶38. The testimony of Chief Boyd, who responded to the fire scene, also supported the verdict. As acknowledged in the statement of facts, he observed a large area of blood on the mattress, and found that the blood had soaked through the cotton mattress, the carpet and the carpet padding, as well as onto the wood subflooring. Chief Boyd testified that he found this amount of bleeding to be unusual for a death caused by fire. He also testified that upon his arrival, he observed that Rayner did not appear to be coughing or suffering symptoms of smoke inhalation, nor did he appear to be injured, burned, or have singed hair. Chief Boyd's testimony that the roof over Sonya's body remained intact and that no heavy objects lay in the vicinity of the body also provided support to the State's theory that Sonya died of blunt-force trauma to the head prior to the fire.

¶39. Prior to deliberation, the trial court instructed the jury that

18

deliberate design[,] as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a "deliberate design" cannot be formed at the very moment of the fatal act.

¶40. The trial court also instructed the jury on the difference between circumstantial evidence and direct evidence, and explained that "[t]he law makes no distinction between the weight to be given either direct or circumstantial evidence." The trial court instructed the jury that they, as the jury, "should decide how much weight to give any evidence."

¶41. After reviewing the transcript, we find that the record reflects sufficient evidence from which the jury reasonably could have rejected Rayner's theory of defense, and the evidence in the record is sufficient to support the verdict of guilty. *See Cotton*, 144 So. 3d at 140 (¶3).

II. **Whether the trial court erred in denying Rayner's motion for a new trial**.

¶42. In the alternative, Rayner claims that the trial court erred in denying his motion for a new trial, arguing that his conviction is against the overwhelming weight of the evidence. In *Cotton*, 144 So. 3d at 142 (¶9), the supreme court stated that "[a] motion for a new trial should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." Additionally, "[w]hen reviewing the denial of a motion for a new trial," this Court must view the evidence "in the light most favorable to the verdict." *Id*. "A verdict should be upheld unless it 'is so contrary to the overwhelming weight of the evidence that

19

to allow it to stand would sanction an unconscionable injustice.'" *Id*. "When this Court analyzes a jury's verdict to determine whether it goes against the overwhelming weight of the evidence, we must keep in mind that the jury is the ultimate finder of fact." *Reeves v. State*, 825 So. 2d 77, 80 (¶8) (Miss. Ct. App. 2002). We recognize that "[j]urors . . . have the duty[] to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding[s] of fact sufficient to support their verdict." *Id*.; *see Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)).

¶43.    As stated, the record reflects that Dr. LeVaughn testified that Sonya's cause of death was homicide caused by blunt-force trauma to her head. The State also presented evidence relevant to motive and to marital discord in the testimony of two bank employees. Jadrienne Cowan testified that on the morning of February 14, 2011, Rayner and Sonya came into BankPlus. Cowan observed that Rayner seemed agitated with Sonya, and Sonya seemed nervous. Cowan also observed the couple have a "heated" argument in the bank parking lot, and she watched Sonya walk off. Sara Jernigan also testified that on February 15, 2011, Rayner entered the bank and asked for a new debit card, and also inquired about closing Sonya's debit card and her bank account. Jernigan stated that Rayner's strange behavior and his questions about closing Sonya's account caused her to feel very uneasy and to physically shake by the time Rayner left the bank. Alternatively, in support of the defense's theory, Dr. Hayne opined that Sonya's death was caused by an overdose. However, the record reflects

20

that Dr. Hayne admitted that he conducted no examination of Sonya's tissue, as Dr. LeVaughn had. The jury heard testimony from the two experts, and the jury accepted Dr. LeVaughn's testimony, along with testimony of the other State witnesses, as to the cause and manner of death.

¶44. After viewing the evidence in the light most favorable to the verdict, we cannot find that the evidence weighs heavily against the jury's decision to find Rayner guilty of murder. *See Cotton*, 144 So. 3d at 142 (¶9).

### III. Whether the trial court erred in denying Rayner's motion for a mistrial.

¶45. Rayner next asserts that the trial court erred in denying his motion for a mistrial. The record before us reflects that Rayner raised an objection and moved for a mistrial after the testimony of both Margaret Rogers and Tiara Smith.

¶46. Rayner submits that the State called Rogers, an employee of Northside Package, to the stand to testify about flammable liquor in an attempt to suggest to the jury that Rayner purchased flammable liquor to use as an accelerant in burning his deer camp. Rayner objected to the relevancy of Rogers's testimony, arguing that Rogers failed to possess any information regarding what Rayner bought on February 14, 2011. Out of the presence of the jury, Rayner moved for a mistrial, claiming the State tried to introduce evidence that it knew was not relevant. The State admitted that Rogers did not know what Rayner purchased, but explained that the State intended to establish through Rogers's testimony that Rayner purchased more than the "fifth" of Kahlua and "fifth" of Irish Cream he claimed. The trial

21

court denied Rayner's motion for a mistrial and instructed the jury to disregard Rogers's testimony "in full as though she never took the witness stand." The law presumes that the jury will follow the judge's instruction.[7]

¶47. The State later called Tiara Smith, Sonya's employee at Yankee Candle, as its final witness. After only a few questions, and in response to the prosecutor asking her when she met Rayner, Smith immediately began sobbing and stated, "Sonya did not deserve this." Rayner immediately objected to this testimony and moved for a mistrial. After questioning Smith outside the presence of the jury, the parties agreed on a stipulation of her testimony, which the trial court read to the jury, and which stated the following: Smith was Sonya's coworker at Yankee Candle in Northpark Mall; and Rayner went into the Yankee Candle after 12 p.m. on February 15, 2011, the day of Sonya's death, inquiring about Sonya's life insurance policy. However, on appeal, Rayner asserts that "the jury's neutrality had been irreparably damaged by this improper and extremely prejudicial testimony." The trial court denied Rayner's motion for a mistrial and ordered Smith's testimony stricken from the transcript. The trial court further ordered the jury to disregard Smith's entire testimony, and then the trial court read the parties' stipulation to the jury. Rayner argues that the jury could not simply "forget" what Smith blurted out as she sobbed, implying that Sonya "didn't deserve" to be killed by Rayner.

---

[7] *Pitchford v. State*, 45 So. 3d 216, 240 (¶96) (Miss. 2010) (citing *Chase v. State*, 645 So. 2d 829, 853 (Miss. 1994)).

¶48. The State, however, argues that Smith could have been referring to a number of things when she said "Sonya didn't deserve this." The State maintains that Smith's spontaneous statement does not imply that Rayner killed Sonya. The State further submits that Smith's spontaneous statement, if improper, was not so egregious as to irreparably prejudice the jury against Rayner. In reviewing this issue, we acknowledge that Smith's spontaneous statement was not responsive to the question posed by the prosecutor when inquiring as to when she met Rayner.

¶49. "Whether to grant a mistrial is within the sound discretion of the trial court." *Dora v. State*, 986 So. 2d 917, 921 (¶8) (Miss. 2008). This Court applies an abuse-of-discretion standard when reviewing a denial of a motion for mistrial. *Id*. In *Harrell v. State*, 947 So. 2d 309, 316 (¶23) (Miss. 2007) (citing *Parks v. State*, 930 So. 2d 383, 386 (¶5) (Miss. 2006)), the supreme court held: "The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." The court further explained that "the trial judge is permitted considerable discretion in determining whether a mistrial is warranted because the judge is best positioned to measure the prejudicial effect."

¶50. In the present case, as stated previously, Rayner moved for a mistrial after Rogers's testimony. The trial court overruled the motion, and instructed the jury to disregard Rogers's testimony in full. The trial court also told the jury that if they did not understand this instruction to disregard Rogers's testimony, to raise their hands. The record reflects that no

juror raised his or her hand. Rayner also moved for a mistrial after Smith's attempted testimony. The trial court also denied this motion, and instructed the jury to disregard Smith's testimony and instead allowed the parties to agree to a stipulation of her testimony, which the trial court read to the jury.

¶51. In situations where "serious and irreparable damage has not resulted, the judge should admonish the jury then and there to disregard the impropriety." *Ford v. State*, 147 So. 3d 325, 330 (¶11) (Miss. 2014) (quoting *Carpenter v. State*, 910 So. 2d 528, 534 (¶21) (Miss. 2005)). Furthermore, "where the trial judge sustains an appellant's objection to the testimony of a witness and instructs the jury to disregard the same, prejudicial error does not result from that testimony." *Ford*, 147 So. 3d at 330 (¶11). In this case, the judge so instructed the jury to disregard the testimony of Smith and Rogers in full, and he also struck Rogers's appearance as well as her testimony. We find that the remedial measures taken by the trial judge were sufficient to cure any prejudice caused by Rogers's or Smith's testimony. *See Spann v. State*, 771 So. 2d 883, 890 (¶13) (Miss. 2000).

¶52. After reviewing the transcript, we find no evidence that the jury disregarded the trial judge's instruction regarding the testimony of Rogers and Smith. As a result, we find that the trial court did not abuse its discretion by denying a mistrial. *Dora*, 986 So. 2d at 921 (¶8).

**IV. Whether Rayner was denied his Sixth Amendment right to a fair and impartial trial due to the prosecutor's allegedly improper and prejudicial remarks regarding the credibility of expert witness Dr. Steven Hayne during cross-examination and in closing arguments, and the trial court's appointment of a jury foreman.**

24

¶53.     Rayner argues that during closing rebuttal argument, the prosecutor herein improperly commented on the credibility of the defense's expert witness, Dr. Hayne, thereby prejudicing Rayner and denying him a fair and impartial trial.  Rayner specifically takes issue with the following statement by the prosecutor:  "Then you go to Dr. Hayne, a discredited doctor in the State of Mississippi."  Rayner submits that no evidence exists in the record, nor even a suggestion that Dr. Hayne has been or is a discredited doctor or expert in forensic pathology. Rayner, quoting *Edmonds v. State*, 955 So. 2d 787, 792 (¶8) (Miss. 2007), maintains that the Mississippi Supreme Court has clearly provided that Dr. Hayne is "qualified to proffer expert opinions in forensic pathology."

¶54.     We have examined Rayner's assignment of error in context of the evidence presented in this case, as well as its context in the State's closing argument.[8]  *See Easter v. State*, 83 So.

_____

[8] Rayner also takes issue with the prosecutor speaking directly to the jury at the close of the State's case-in-chief and telling the jury, "[d]on't get hurt while you are out there," as they left the courtroom to view the scene of the fire.  Rayner argues this comment was "an attempt to garner the jury's friendship and the appearance that the State is the 'good guy.'" Rayner admits that he failed to object to this comment, but submits that this communication to the jury was highly improper and prejudiced Rayner's defense.  The record reflects that Rayner claims Sonya may have been killed by some structural damage to the house during the fire, which may have caused a heavy object to fall on her and resulted in blunt-force trauma.  The jury was touring the fire scene.  Hence, a safety caution appears appropriate, but this comment is also beyond the scope of appellate review since Rayner raised no objection to the comment below. *See  Goff v. State*, 14 So. 3d 625, 655 (¶118) (Miss. 2009) (citations omitted).
     In *Anderson v. State*, 154 So. 3d 42, 57 (¶48) (Miss. Ct. App. 2014) (citation omitted), this Court stated that "[t]he standard of review for prosecutorial misconduct has been clearly established by the Mississippi Supreme Court as follows: Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow."  This Court has also "determined that although a remark may be improper, we will not reverse a conviction unless this Court is convinced that the remark

25

3d 442, 444 (¶7) (Miss. Ct. App. 2011). A review of the evidence in the record and of the State's disputed comment during closing argument reflects that the State commented on the evidence admitted during the trial, and inference therefrom, primarily elicited during the cross-examination of Dr. Hayne. During the State's cross-examination of Dr. Hayne, the prosecutor elicited from Dr. Hayne that three cases he had testified in had been reversed by the Mississippi Supreme Court. The prosecutor asked Dr. Hayne: "You told me during lunch the reason you have to carry around that big notebook with you is you have to defend yourself nowadays for all the reversals you've had in the Mississippi Supreme Court; is that correct?" In response to the question by the prosecutor, Rayner objected to the relevancy and improper questioning of Dr. Hayne. However, the trial court overruled the defense objection, finding that the cross-examination question related to Dr. Hayne's credibility. The trial court then allowed the prosecutor to proceed with his line of questioning related to the

contributed to the verdict." *Green v. State*, 887 So. 2d 840, 844 (¶8) (Miss. Ct. App. 2004) (citing *King v. State*, 788 So. 2d 93 (¶16) (Miss. Ct. App. 2001)). When making closing arguments, an attorney is granted broad latitude. *Baskin v. State*, 991 So. 2d 179, 183 (¶18) (Miss. Ct. App. 2008).

Regarding his claim that the prosecutor made an improper comment to the jury by warning them "[d]on't get hurt while you are out there" when going to view the scene of the fire, Rayner acknowledges he failed to make a contemporaneous objection to the comment, and asks this Court to review it for plain error. However, we recognize the supreme court's instruction that "issues not presented to the trial court for lack of contemporaneous objection are procedurally barred, and error, if any, is waived." *Goff*, 14 So. 3d at 655 (¶118). Furthermore, "[q]uestions of prosecutorial misconduct will not be addressed where the defendant did not raise the question at trial[, and the] [f]ailure to object at trial acts as a procedural bar in an appeal." *Jackson v. State*, 832 So. 2d 579, 581 (¶3) (Miss. Ct. App. 2002); *see also Carr v. State*, 655 So. 2d 824, 853 (Miss. 1995); *Dufour v. State*, 483 So. 2d 307, 311 (Miss. 1985).

credibility of Dr. Hayne's expert opinion. Then, in his testimony during cross-examination, Dr. Hayne admitted that he defended against three reversals of criminal convictions in cases where he had given expert testimony concerning the cause and manner of death. Dr. Hayne also admitted that the supreme court reversed a conviction because the supreme court determined that, in support of the conviction, Dr. Hayne had testified outside of his manner of expertise.

¶55. Upon the backdrop of the evidence elicited from Dr. Hayne on cross-examination and the other evidence in the case, the record then shows that during closing rebuttal argument, Rayner objected to the prosecutor commenting on Dr. Hayne's credibility, wherein the prosecutor stated that Dr. Hayne had been discredited. The trial court sustained the objection, instructing the jury to disregard the statement concerning Dr. Hayne's character. Rayner argues that the prosecutor's statement during closing argument was improper and highly prejudicial. Rayner also argues that the argument constituted a misrepresentation of the law in front of the jury to which Rayner could not counter, since the comment occurred during closing rebuttal argument.

¶56. Rayner asserts that Dr. Hayne is a certified forensic pathologist in Mississippi and is certified in anatomical and clinical pathology. Rayner further submits that the murder charge hinged entirely upon the credibility of Dr. LeVaughn and Dr. Hayne, and as a result, Rayner claims that the prosecutor's allegedly improper comment was unquestionably intended to influence the jury and intended to relieve the jury of its critical duty to determine the

27

credibility of the expert witnesses. Rayner fails to address the testimony elicited at trial from Dr. Hayne wherein he admitted that the supreme court reversed some convictions that brought the credibility of his expert opinions therein into question, and that in one case, the supreme court concluded that Dr. Hayne testified outside of his area of expertise.

¶57. Significant to our review, a review of the record reflects that in response to the State's allegedly objectionable remarks during closing rebuttal argument, the defense indeed objected but failed to raise a motion for a mistrial. As acknowledged, in response to Rayner's objection, the trial court instructed the jury to disregard the prosecutor's comments about Dr. Hayne's character. The defense asked for no further remedial action.

¶58. In turning to address the State's comments about Dr. Hayne made during the closing rebuttal argument, as discussed, we recognize that when reviewing a claim of prosecutorial misconduct, this Court will view the prosecutor's remarks "in light of the entire trial." *Easter*, 83 So. 3d at 444 (¶7); *see Byrom v. State*, 863 So. 2d 836, 872 (¶123) (Miss. 2003). Since Rayner failed to move for a mistrial based on improper argument, we will review to determine if any plain error resulted from the State's closing argument. We acknowledge that in *Dora*, 986 So. 2d 917 at (¶8), and other precedent, the supreme court stated that "attorneys are allowed a wide latitude in arguing their cases to the jury," but the supreme court prohibits the use of "tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." The *Dora* court found "that standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing

28

arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Id.* After examining the trial before us as a whole, we find no evidence that Rayner was denied a fundamentally fair trial from the prosecutor's statements made during the State's closing argument, or that a reversible error occurred due to any prosecutorial misconduct.

¶59. In *Holland v. State*, 705 So. 2d 307, 335 (¶92) (Miss. 1997), consistent with the holding in *Dora*, the supreme court explained that during the State's closing argument, the State may comment upon the evidence presented at trial and argue logical inferences drawn therefrom.

¶60. As discussed, Dr. Hayne testified on cross-examination about three prior cases where his expert opinion and testimony provided evidence supporting the conviction, and the convictions were then reversed on appeal. Dr. Hayne also admitted in his testimony that reversals occurred in convictions where the cause and manner of death were in dispute, similar to the issues in dispute in the instant case. During cross-examination, Dr. Hayne admitted to testifying in three cases that the supreme court reversed upon appellate review. He also admitted that in one of the cases the supreme court reversed, the court found that Dr. Hayne testified outside the scope of his expertise in a case involving the cause and manner of death. Precedent allows the prosecutor to argue during closing argument about the evidence and logical inferences drawn from Dr. Hayne's testimony. The State's closing

29

argument challenged the credibility of the defense's evidence, including Dr. Hayne's expert testimony. *See Pitchford v. State*, 45 So. 3d 216, 234 (¶67) (Miss. 2010); *Dora*, 986 So. 2d at 921 (¶8).

¶61. The record also reflects no request by the defense for a limiting instruction nor a motion for a mistrial by Rayner's attorney as a result of the prosecutor's comments. *See Easter*, 83 So. 3d at 444 (¶8).[9] Moreover, the prosecutor's closing arguments reflect nothing more than a comment on the crediblity of the defense's evidence. Therefore, we find no merit to this assignment of error.

¶62. Additionally, Rayner claims that he was denied his right to a fair and impartial trial due to the fact that the trial court judge initially appointed the jury foreman, to which Rayner objected. The trial judge stated, "Ladies and gentle[men], we've had an objection as to the foreman[;] we are going to let the jury pick the foreman." Rayner objected again to the trial judge's statement that Rayner had an objection to the foreman, when the objection was actually to the trial court's appointment of the foreman, not the foreman himself. The trial court corrected its statement and instructed the jury that Rayner "did not have an objection to the foreman[, but] . . . to the way the foreman was selected."

¶63. The record reflects that during deliberation, the jury chose that same juror as originally appointed by the trial judge to serve as foreman. Rayner suggests that the jury could have taken offense by thinking that Rayner objected to the specific foreman that the trial court

---

[9] *See Dora*, 986 So. 2d at 921 (¶8).

appointed, as opposed to objecting to the procedure of the appointment. Furthermore, Rayner asserts that the jury then appointed the same foreman that had been previously appointed by the trial judge to spite Rayner and out of obligation to the trial judge.

¶64. The supreme court has instructed that "trial judges are advised not to appoint jury foremen. Who is to be the foreman is a decision which should be made by fellow jurors." *Ballenger*, 667 So. 2d at 1259. The record reflects that upon Rayner's objection to the trial judge appointing a jury foreman, the trial judge withdrew his appointment and then instructed the jury to appoint the foreman instead. The record further reflects that the trial judge asked the jury whether they understood his clarification that Rayner objected to the way the foreman was selected, rather than the foreman himself. The record shows that the "jurors [gave] an affirmative response."[10] We find that Rayner failed to show that the trial judge's statements prejudiced his right to have a fair trial. *Baskin*, 991 So. 2d 184 (¶26) (citing *Walker v. State*, 913 So. 2d 198, 249 (¶206) (Miss. 2005)) (reiterating that "a criminal defendant is not entitled to a perfect trial, only a fair trial"). Rayner failed to request any further clarification to the jury by the trial court, and Rayner raised no motion for a mistrial regarding the foreman's appointment or the trial court's clarification. This issue therefore lacks merit.

### CONCLUSION

¶65. Finding no error, we affirm Rayner's conviction and sentence.

---

[10] Precedent establishes that the jury is presumed to follow the instructions of the judge. *Pitchford*, 45 So. 3d at 240 (¶96) (citing *Chase*, 645 So. 2d at 853).

¶66. **THE JUDGMENT OF THE JASPER COUNTY CIRCUIT COURT OF CONVICTION OF DELIBERATE-DESIGN MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, MAXWELL, FAIR AND WILSON, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.**